## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



ATTORNEYS FOR APPELLANTS

Mark Small
Indianapolis, Indiana

Kimberly A. Jackson
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

David E. Corey
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Termination of the Parent-Child Relationship of:

J.B. and P.C. (Minor Children),
and

J.B. (Mother) and B.C. (Father),

*Appellants-Respondents,*

> v.

The Indiana Department of Child Services,

*Appellee-Petitioner.*

July 16, 2018

Court of Appeals Case No.
18A-JT-349

Appeal from the Vigo Circuit Court

The Honorable Sarah K. Mullican, Judge

The Honorable Daniel W. Kelly, Magistrate

Trial Court Cause No.
84C01-1707-JT-922 & 84C01-1707-JT-923

**Riley, Judge.**

## STATEMENT OF THE CASE

Appellants-Respondents, J.B. (Mother) and B.C. (Father) (collectively, Parents), separately appeal the termination of their parental rights to their minor children, P.C. and J.R.B. (Children).

We affirm.

## ISSUE

Mother and Father each raise three issues on appeal, which we restate as: Whether the Indiana Department of Child Services (DCS) presented clear and convincing evidence to support the termination of Parents' parental rights.

## FACTS AND PROCEDURAL HISTORY

Father and Mother are the biological parents of P.C., born on February 10, 2014, and J.R.B., born on September 29, 2015. The day after J.R.B.'s birth, DCS received a report that Mother had tested positive for methamphetamines, amphetamines, and cannabinoids. When a Family Case Manager (FCM) visited Mother, Mother admitted that she had used methamphetamines one or two days before giving birth and had "smoked marijuana about once a week during her pregnancy." (Exh. Vol., p. 30). J.R.B.'s meconium returned positive for methamphetamine, amphetamines, and marijuana. The FCM inquired about P.C. and was informed that she was with Father. Even though the FCM impressed on Mother the importance of having Father call the FCM, Father failed to do so. On October 1, 2015, the trial court ordered the removal of the Children from the parents' home.

On October 20, 2015, the trial court conducted an initial hearing, at which time Parents entered a stipulation, admitting that the Children were Children in Need of Services (CHINS) "due to drug use in the home." (Exh. Vol. p. 43). After a dispositional hearing was conducted on November 17, 2015, the trial court entered its decree, directing Parents, in relevant part, to participate in any programs recommended by DCS or other service providers; maintain suitable housing; refrain from illegal drug use; engage in home-based counseling; complete a substance abuse assessment and follow all treatment recommendations; submit to random drug screens; meet the Children's medical and mental health needs; and attend visits with the Children. The DCS referred Parents for services, including among others, to the Hamilton Center for drug and alcohol assessments, to a home based case worker to assist with coping skills, housing, employment and transportation, and to individual therapy sessions.

From the beginning, Parents' participation in services was problematic. Mother's compliance with drug services was "sporadic" and "she never completed anything." (Transcript p. 8). While she completed the drug and alcohol assessment in December 2015, she failed to consistently attend the recommended outpatient and individual therapy. Mother missed a lot of drug screens and when she "did screen[,] they were positive for methamphetamine, sometimes methamphetamine and marijuana. Rarely did she have a negative result." (Tr. p. 9). Even though Father missed a lot of drug screens, he "sometimes would be positive for methamphetamine or marijuana but not as

many times as" Mother. (Tr. p. 9). Both Mother and Father had to restart drug treatment several times because they failed to attend many appointments. Even though Parents had been ordered to find employment, during the course of the CHINS proceedings, Father was only temporarily employed. Mother had "gotten a job at Hardees and showed up one day and never showed back up." (Tr. p. 7). Although Father owned a house, Parents were living mostly with relatives because "they didn't have electricity at the house and they couldn't afford to get it turned on." (Tr. p. 7).

[7] On January 11, 2016, the State charged Mother with two Counts of maintaining a common nuisance, as a Level 6 felony and as a Class B misdemeanor. Mother entered into a plea agreement, agreeing to plead guilty to the Class B misdemeanor. On August 8, 2016, she was sentenced to 180 days, with 174 days suspended. Upon her release, Mother commenced living at Freebirds, a local sober living environment but she was told to leave at the end of January because she was using drugs. DCS referred Mother to Harbor Lights for inpatient drug rehabilitation. Despite DCS offering Mother three different options of taking her to Harbor Lights, Mother failed to attend—"[s]he had excuses." (Tr. p. 12).

[8] While Mother participated more often than Father, both Parents did attend the supervised visits with their Children. During the visits, it became clear that Parents were more bonded with P.C. than J.R.B. Parents would argue in front of the Children to the point the FCM would have to intervene and ask Parents to stop. DCS would screen Mother after the visit, "and the screens would come

back positive for methamphetamine so she usually [] had something in her system when she was visiting the [C]hildren." (Tr. p. 10).

[9] After July 2016, DCS updated its referrals for services because Parents had been noncompliant and had closed out of most of them. At the beginning of August 2016, Parents were still not compliant with services and continued to miss and test positive on drug screens. Accordingly, on September 15, 2016, the trial court, at DCS's request, changed the permanency plan to termination and on December 6, 2016, DCS filed a petition to terminate Parents' rights to the Children.

[10] DCS's filing appeared to spur Parents into action and both Mother and Father started complying with services. They both had assessments with the therapist at Hamilton Center to reengage in the addiction treatment and home based case management. Father completed a new substance abuse assessment on February 10, 2017, which recommended dual diagnosis group therapy and then follow up with a rehab prevention group. Father completed the dual diagnosis group in May 2017, but was subsequently closed out of services unsuccessfully due to not following up with the rehab prevention group. He was also referred for a mental health assessment. After completing the mental health evaluation, Father was diagnosed with social anxiety disorder, major depressive disorder, and stimulant use disorder. He declined the recommended individual and group therapy because he did not believe that his "disorder can be treated with therapy or medication." (Tr. p. 18). Although Parents' compliance with home based case management remained minimal, they did start to comply with the

addiction treatment and submit to drug screens. From December 2016 until May of 2017, Parents still missed screens but the ones they did submit to were negative.

[11] Because Parents showed some compliance with services, DCS dismissed its petition to terminate Parents' rights. However, by July 2017, Parents were again noncompliant with the drug screens and their attendance with home based case management services was "very sporadic." (Tr. p. 31). Mother stopped her addiction treatment because "since the termination case was dismissed she didn't have a reason to go anymore." (Tr. p. 18). One of Parents' major complaints was that the bus route did not go "all the way to their house so they would have to walk all the way to the bus route to be able to use their bus pass[.]" (Tr. p. 20). Even though Parents had two different cars, "they didn't last very long." (Tr. p. 21). They would stay with relatives in town to be closer to the bus stop, but they were still late to visits and missed appointments.

[12] Parents' attendance at supervised visits was problematic. Mother visited more consistently than Father. Even after visitation was changed to accommodate Father's work schedule, Father "hardly" attended. (Tr. p. 32). During these visits, Mother struggled with implementing parenting techniques and she tended to favor P.C., refusing to discipline her as Mother did not "want to be the bad guy." (Tr. p. 33). Mother basically ignored J.R.B. When Father attended, he would be "very laid back," and did not attempt to parent the

Children because Mother "undermine[d] his authority." (Tr. p. 33). Mother was observed to be under the influence during almost all the visits.

[13] By August 2017, Parents were no longer in compliance with their services. Mother tested positive for methamphetamines three times in July and once in August. DCS attempted to work with Parents to get them screened, and despite asking Parents where and when they would be available, Parents would still miss the screening. Neither Parent was compliant with substance abuse treatment, parenting classes, or contacting the FCM. During this time, Parents were only briefly employed. Mother worked at Burger King "maybe one or two days" after which she became employed at Golden Corral. (Tr. p. 19). Without providing proof of employment, Father informed DCS that he worked odd jobs for which he was "paid under the table." (Tr. p. 20).

[14] On August 7, 2017, DCS filed its petition to terminate Parents' rights. On August 10, 2017, Mother was arrested at a hotel and charged with maintaining a common nuisance, possession of methamphetamines, and unlawful possession of a syringe. On November 16, 2017, Mother pled guilty to possession of methamphetamine and unlawful possession of a syringe, both as Level 6 felonies, and received concurrent sentences of one and one-half year, with 14 days executed and the remainder suspended to probation.

[15]   In September 2017, Mother gave birth to her third child, B.C., Jr. (Sibling).[1] Although she did not test positive at Sibling's birth, she admitted to using drugs while pregnant. Mother returned to the Hamilton Center for addiction treatment in November of 2017 with a recommendation to restart substance abuse programs. After attending one session, Mother did not return. Mother again tested positive on November 17, 2017 for methamphetamine, amphetamines, and THC, and Father's screen of November 13, 2017 was positive for methamphetamines, amphetamines, opiates, and hydrocodone.

[16]   On December 4, 2017, the trial court conducted a hearing on DCS's petition. Although the Parents failed to attend, their respective counsel was present. During the hearing, evidence was presented that since their removal, the Children had been in three different foster homes. After "alleged abuse from the foster mom" in the first home, the Children were placed in a second, pre-adoptive home. However, the foster parents asked for the Children to be placed elsewhere when the first termination proceeding was dismissed and there was a possibility that the Children might not be adopted. They have remained in their current foster home since April 24, 2017. J.R.B. is doing very well in foster care, while P.C. has some "growth development" issues for which she is receiving therapy. (Tr. p. 48). However, the Children's Court Appointed Special Advocate (CASA) informed the trial court that P.G. plays in feces after

---

[1] The record reflects evidence that Sibling has been removed from Parents' care. However, Sibling is not part of these proceedings.

returning from supervised visits with Parents. Being the Children's CASA since their removal, CASA recommended that the Parents' rights be terminated. CASA opined that Father "cannot break away from [Mother]." (Tr. p. 51). "I think at this point with this case, what I've seen with this case, the [C]hildren a little over two years in DCS, in foster care, the number of placements they have been, [termination of Parents' rights] is the best thing right now." (Tr. p. 63).

[17] On December 8, 2017, the trial court entered its Order, finding that there is a reasonable probability that the conditions which resulted in the removal of the Children from their Parents or the reasons for placement outside the home of the Parents will not be remedied and that the continuation of the parent-child relationship poses a threat to the well-being of the Children. Accordingly, as termination was in the Children's best interests, the trial court terminated the Parents' rights to their Children.

[18] Parents now appeal. Additional facts will be provided as necessary.

# DISCUSSION AND DECISION

## I. *Standard of Review*

[19] Parents challenge the termination of their parental rights to the Children. The Fourteenth Amendment to the United States Constitution protects the traditional right of parents to establish a home and raise their children. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). "A parent's interest in the care, custody, and control of his or her children is 'perhaps the oldest of the fundamental liberty interests.'" *Id.* (quoting *Troxel v.*

*Granville*, 530 U.S. 57, 65 (2000)). However, parental rights "are not absolute and must be subordinated to the child's interests in determining the proper disposition of a petition to terminate parental rights." *Id.* If "parents are unable or unwilling to meet their parental responsibilities," termination of parental rights is appropriate. *Id.* We recognize that the termination of a parent-child relationship is "an 'extreme measure' and should only be utilized as a 'last resort when all other reasonable efforts to protect the integrity of the natural relationship between parent and child have failed.'" *K.E. v. Ind. Dep't of Child Servs.*, 39 N.E.3d 641, 646 (Ind. 2015).

[20] Indiana courts rely on a "deferential standard of review in cases concerning the termination of parental rights" due to the trial court's "unique position to assess the evidence." *In re A.K.*, 924 N.E.2d 212, 219 (Ind. Ct. App. 2010), *trans. dismissed*. Our court neither reweighs evidence nor assesses the credibility of witnesses. *K.T.K. v. Ind. Dep't of Child Servs.*, 989 N.E.2d 1225, 1229 (Ind. 2013). We consider only the evidence and any reasonable inferences that support the trial court's judgment, and we accord deference to the trial court's "opportunity to judge the credibility of the witnesses firsthand." *Id.* Where, as in this case, the trial court enters special findings of fact and conclusions thereon under Indiana Trial Rule 52(A), we evaluate whether the trial court's decision is clearly erroneous. *Id.* Under this standard, we must determine "whether the evidence clearly and convincingly supports the findings and the findings clearly and convincingly support the judgment." *Id.* at 1230.

## II. *Termination of Parental Rights Statute*

In order to terminate a parent's rights to his or her child, DCS must prove:

(A) that one (1) of the following is true:

(i) The child has been removed from the parent for at least six (6) months under a dispositional decree.
* * * *
(iii) The child has been removed from the parent and has been under the supervision of a local office . . . for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a [CHINS] . . . ;

(B) that one (1) of the following is true:

(i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii) The child has, on two (2) separate occasions, been adjudicated a [CHINS];

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). DCS must prove each of the foregoing elements by clear and convincing evidence. *C.A. v. Ind. Dep't of Child Servs.*, 15 N.E.3d 85,

92 (Ind. Ct. App. 2014). "[C]lear and convincing evidence requires the existence of a fact to 'be highly probable.'" *Id.* On appeal, Parents do not contest the trial court's findings that the Children have been removed from the home for the requisite period of time or that DCS has established a satisfactory plan for the Children's care and treatment.

## A. *Remediation of Conditions*

[22] We now turn to Parents' contention that the trial court erroneously concluded that there is a reasonable probability either that the conditions resulting in the Children's removal and continued placement out of Parents' custody will not be remedied or that the continuation of the parent-child relationship poses a threat to the Children's well-being. We elect to dispose of this element via the former prong.

[23] In determining whether there is a reasonable probability that conditions will not be remedied, we must identify what conditions led to the Children's "placement and retention" outside the home and subsequently determine whether there is a reasonable probability that those conditions will not be remedied. *K.T.K.*, 989 N.E.2d at 1231. In making these decisions, a court "must judge a parent's fitness as of the time of the termination proceeding, taking into consideration evidence of changed conditions—balancing a parent's recent improvements against habitual pattern[s] of conduct to determine whether there is a substantial probability of future neglect or deprivation." *In re E.M.*, 4 N.E.3d 636, 643 (Ind. 2014) (citation and internal quotation marks omitted) (quoting *Bester*, 839 N.E.2d at 152; *K.T.K.*, 989 N.E.2d at 1231). "Habitual conduct may

include 'criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment.'" *K.E.*, 39 N.E.3d at 647. "A pattern of unwillingness to deal with parenting problems and to cooperate with those providing social services, in conjunction with unchanged conditions, support a finding that there exists no reasonable probability that the conditions will change." *Lang v. Starke Cnty. Office of Family & Children*, 861 N.E.2d 366, 372 (Ind. Ct. App. 2007), *trans. denied*. DCS need not "provide evidence ruling out all possibilities of change; rather, it need only establish 'that there is a reasonable probability that the parent's behavior will not change.'" *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1157 (Ind. Ct. App. 2013), *trans. denied*. However, prior to analyzing whether Parents have remediated the conditions which led to the Children becoming CHINS, we first have to address Mother and Father's individual arguments.

### 1. *Stable Housing*

[24] We first address Mother's claim that she "did not lack stable housing, only a stable address." (Mother's Br. p. 19). Although the record reflects that Mother lived with Father, who owned his own residence, Parents lived with relatives or friends for the majority of these proceedings because Father could not afford the utilities on the residence, or they wanted to live closer to a bus stop to have easier transportation to participate in services. A trial court may properly consider, among other things, evidence of a parent's lack of adequate housing. *McBride v. Monroe Co. Office of Family and Children*, 798 N.E.2d 185, 199 (Ind. Ct. App. 2003).

Parents choose a transient life style, "bouncing around" from place to place. (Tr. p. 7). Although DCS referred Parents—at least twice—to home based case management services for assistance with housing and employment, Parents did not participate and services were closed out. Accordingly, the trial court properly found Mother lacked stable housing.

## 2. *Results of Drug Screens*

Parents' main contention with the trial court's decision focuses on the evidence of Parents' drug screens. Both Mother and Father assert that the trial court's reliance on their positive tests was erroneous because DCS intentionally did not offer any evidence of actual drug screen results. Rather, the evidence included in the record to support the trial court's finding relied on witness testimony and exhibits in which DCS or CASA alleged drug use. Mother contends that "DCS presented no evidence of specific laboratory test results showing Mother tested positive for controlled substances. Through the testimony and exhibits [], DCS simply reported information gained from an unidentified source whose reliability has never been determined." (Mother's Br. p. 21).

However, at no point during the hearing did either of the Parents object to the admission of this evidence. Because they failed to object, they now invoke the fundamental error doctrine, which permits a reviewing court to consider the merits of an improperly raised error if the reviewing court finds that "the record reveals error so prejudicial to the rights of the appellant that he could not have had a fair trial." *Grier v. State*, 240 N.E.2d 494, 496 (Ind. 1968). "The

fundamental error doctrine is extremely narrow and applies only when the error constitutes a blatant violation of basic principles, the harm or potential for harm is substantial, and the resulting error denies the defendant fundamental due process." *Johnson v. Wait*, 947 N.E.2d 951, 959 (Ind. Ct. App. 2011), *trans. denied*. The doctrine applies when "an error was so egregious and abhorrent to fundamental due process that the trial judge should or should not have acted, irrespective of the parties' failure to object or otherwise preserve the error for appeal." *Whiting v. State,* 969 N.E.2d 24, 34 (Ind. 2012).

[28] Nevertheless, we do not need to decide Parents' fundamental error allegation. Even discounting Parents' positive drug screens, the record is replete with evidence that Parents failed to follow DCS's recommendations. Although Mother completed an initial drug and alcohol assessment, her participation lacked thereafter. She missed numerous drug screens, which were then considered positive tests, and had to restart drug treatment several times. She was twice charged with drug-related offenses. After DCS dismissed its first petition for termination, Mother stopped her addiction treatment because "she didn't have a reason to go anymore." (Tr. p. 18). Despite the fact that Father's participation in substance abuse services was initially better than Mother's, he too missed drug screens, which were subsequently considered positive, and had to restart services several times. However, by August 2017, Parents were no longer in compliance and, even though DCS attempted to work with them, refused to be screened for substance abuse compliancy.

### 3. *Due Process Argument*

In claiming that DCS violated her due process rights during these termination proceedings, Mother points to CASA's testimony that a different outcome would have resulted if "DCS had been more supportive of the [P]arents." (Mother's Br. p. 28). CASA "viewed the obligations placed on the [P]arents by DCS as so burdensome that even she could not have complied with them." (Mother's Br. p. 28). As a consequence, Mother argues that "DCS's overly negative approach impacted the [P]arents' compliance with services." (Mother's Br. p. 29). Although not phrased as a violation of due process rights, Father makes a similar argument alleging that DCS impeded his ability to participate in services.

[29] When terminating a parent-child relationship, the State is bound by the requirements of the Due Process Clause of the Fourteenth Amendment to the United States Constitution. *Lang*, 861 N.E.2d at 376-77. Assessing whether a parent's due process rights have been violated in a termination proceeding involves the balancing of three factors: "(1) the private interests affected by the proceeding; (2) the risk of error created by the State's chosen procedure; and (3) the countervailing government interest supporting use of the challenged procedure." *Id*. "If a record is replete with procedural irregularities throughout CHINS and termination proceedings that are plain, numerous, and substantial, we are compelled to reverse a termination judgment on procedural due process grounds." *A.P. v. Porter Co. Office of Family and Children*, 734 N.E.2d 1107, 1118 (Ind. Ct. App. 2000), *trans. denied*.

[30] CASA testified that DCS staff expected the Parents to take certain actions without DCS giving the Parents the necessary resources to accomplish these tasks in return. As such, CASA mentioned that Parents lived outside the city limits, without transportation, and had to walk three miles to catch the bus. Yet, CASA asserted that Parents were expected to attend appointments, submit to drug tests, and attend visitation in addition to finding employment and handling their own personal affairs. Nevertheless, despite her testimony, CASA advised to terminate Parents' rights to their Children due to the lengthy pendency of the case, and the Parents' inability to change their life style.

[31] DCS is not required to offer services to a parent to correct deficiencies in the parent's ability to care for his or her child. *In re B.D.J.*, 728 N.E.2d 195, 201 (Ind. Ct. App. 2000). Although a participation plan serves as a useful tool in assisting parents in meeting their obligations and DCS routinely offers various services to parents to assist them in regaining custody of their children, termination of parental rights may occur independently of these services, as long as the elements of Indiana Code section 31-35-2-4 are proven by clear and convincing evidence. *Id.* Contrary to CASA's observations, the record establishes that DCS personnel attempted to help Parents succeed in their quest for family reunification. Numerous times DCS offered Parents transportation, home based case management services, and a restart of programs, some even at the request of the Parents—all to no avail.

[32] We reject Parents' suggestion that the responsibility of their failure to achieve sobriety and reunification belonged to the DCS. From one parent to the next,

DCS has no way to know whether addiction treatment is failing because the treatment is not the most appropriate for the parent or because the parent simply does not care enough about reunification to maintain sobriety under any form of treatment. Accordingly, we will not place a burden on DCS to monitor treatment and to continually modify the requirements for substance abuse treatment until a parent achieves sobriety. "Rather, the responsibility to make positive changes will stay where it must, on the parent. If the parent feels the services ordered by the court are inadequate to facilitate the changes required for reunification, then the onus is on the parent to request additional assistance from the court or DCS." *Prince v. Department of Child Services*, 861 N.E.2d 1223, 1231 (Ind. Ct. App. 2007).

### 4. *Remediation*

[33] The entirety of the evidence establishes that the Children were removed from the home for two years by the time of the termination hearing. During that time, Parents had numerous opportunities to make changes in their life in order to become a fit parent. Instead, they maintained a lifestyle that perpetuated the reasons that led to the removal of the Children in the first place. DCS removed the Children from their Parents' care due to drug use in the home. Despite the trial court's order to participate in services aimed at reunification and DCS's help in providing these services, Parents never progressed to even unsupervised visitation. Numerous times, DCS restarted services only for Parents to fail complying with them. Mother "never completed anything." (Tr. p. 18). Instead of being gainfully employed and attend substance abuse treatment,

Mother chose to pursue criminal activity. *See K.T.K.*, 989 N.E.2d at 1235-36 ("Individuals who pursue criminal activity run the risk of being denied the opportunity to develop positive and meaningful relationships with their children."). Although Father's employment and compliance with drug treatment was better than Mother's, he too failed to show progress. Despite a brief spur of action on the part of Parents when DCS filed its first termination petition, this was short lived and Parents abandoned their positive efforts after DCS dismissed its petition. *See id.* at 1234 (noting that a trial court has "discretion to 'disregard the efforts [a parent] made only shortly before termination and to weigh more heavily [the parent's] history of conduct prior to these efforts'").

[34] Although we recognize that Father and Mother did participate in some services and attended supervised visitation with the Children, "where there are only temporary improvements and the pattern of conduct shows no overall progress, the court might reasonably find that under the circumstances, the problematic situation will not improve." *In re A.H.*, 832 N.E.2d 563, 570 (Ind. Ct. App. 2005). In sum, the Children were removed from their Parents' custody because of their unavailability and inability to provide for their basic needs, and during those two years, Parents failed to take any meaningful steps to meet their parental responsibilities. Accordingly, we find ample support in the record for the trial court's determination that there is a reasonable probability that the conditions resulting in the Children's removal and continued placement out of the home will not be remedied.

B. *Best Interests of the Children*

[35] Parents also challenge the trial court's determination that termination of their parental rights is in the best interests of the Children. The parent-child relationship is "one of the most valued relationships in our culture." *Bester*, 839 N.E.2d at 147 (quoting *Neal v. DeKalb Cnty. Div of Family & Children*, 796 N.E.2d 280, 285 (Ind. 2003)). Thus, the purpose of terminating a parent-child relationship is to protect the child, not to punish the parent. *In re C.C.*, 788 N.E.2d 847, 855 (Ind. Ct. App. 2003), *trans. denied*. When considering whether termination would be in a child's best interests, the trial court must "look beyond the factors identified by [DCS] and . . . look to the totality of the evidence." *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1158 (Ind. Ct. App. 2013), *trans. denied*. "The trial court need not wait until the child is irreversibly harmed such that the child's physical, mental and social development is permanently impaired before terminating the parent-child relationship." *K.T.K.*, 989 N.E.2d at 1235. Permanency is a central consideration in determining a child's best interests. *Id.* Nevertheless, "the right of parents to raise their children should not be terminated solely because there is a better home available for the children." *In re K.S.*, 750 N.E.2d 832, 837 (Ind. Ct. App. 2001).

[36] It is well established that "[a] parent's historical inability to provide a suitable environment, along with the parent's current inability to do the same, supports finding termination of parental rights is in the best interests of the children." *In re J.C.*, 994 N.E.2d 278, 290 (Ind. Ct. App. 2013). Moreover, the testimony of

the children's CASA is sufficient to support the trial court's conclusion that termination is in the children's best interests. *See McBride v. Monroe Cnty. Office of Family & Children*, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003). Here, DCS and the Children's CASA testified regarding their concerns about Parents' inability to take proper care of the Children. There is no dispute that Parents were unmotivated in successfully treating their substance abuse addictions, they lacked housing and employment, failed to attend parenting classes, and did not progress beyond supervised visitation. The record establishes that while the Parents are bonded with P.C., J.R.B. has spent her entire life outside of Parents' care. By the time of the termination hearing, both Children had been removed from Parents' care for more than two years, and are thriving in their current foster placement. A court is not required to place children on a shelf until parents are capable of caring for them properly. *See In re Campbell*, 534 N.E.2d 273, 275 (Ind. Ct. App. 1989). Therefore, we find that there is ample evidence to support the trial court's determination that termination of Parents' parental rights is in the Children's best interests.

## CONCLUSION

Based on the foregoing, we conclude that DCS presented clear and convincing evidence to support the trial court's order terminating Parents' rights to their Children.

Affirmed.

May, J. and Mathias, J. concur